Tina M. McDONALD,
Plaintiff–Appellee,

v.

SANDVIK PROCESS SYSTEMS, INC.,
Defendant–Appellant.

No. 87–2450.

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1988.

Decided March 1, 1989.

Rehearing and Rehearing In Banc
Denied April 13, 1989.

---

Richard A. Mayer, Spangler Jennings Spangler & Dougherty, P.C., Merrillville, Ind., for defendant-appellant.

Kevin L. Likes, Grimm & Grimm, P.C., Auburn, Ind., for plaintiff-appellee.

Before WOOD, Jr. and CUDAHY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

This is a products liability suit brought by Tina M. McDonald against Sandvik Process Systems, Inc. (Sandvik) to recover for injuries she sustained on August 12, 1983, in an accident involving a machine made by Alto Corporation (Alto), Sandvik's predecessor corporation.[1] The jury found in favor of McDonald, awarding her $350,000 in damages. Sandvik appeals from the judgment entered on the verdict, claiming as error the denial of its motions for directed verdict, judgment notwithstanding the verdict, and new trial.

## I. FACTS

At the time of her injury, McDonald was employed at the West Baking Company, in Fremont, Indiana, which baked and packaged hamburger buns. She was working as an "indexer," and was responsible for visually inspecting the freshly-baked buns for defects as they were fed by conveyor belt into a slicing and packaging machine—Alto's "Pillo–Pak" Model P–77. The bun slicing machine receives buns in groups of thirty (six wide and five deep) from the indexing area, slices them horizontally with a high-speed blade similar to a band saw, and packs them in plastic.

The conveyor belt is about forty inches wide, and moves "very fast."[2] As the buns are carried toward the blade (in a direction referred to as "downstream"), they pass under a safety bar which would shut off the machine if an object larger than a hamburger bun presented itself. Downstream from the safety bar is a space, accessible from above, between that bar and a second bar. It was this space in which McDonald's injury began to occur. Within this space, the upper ends of the vertical members of three blade guides are attached to the second bar by collars and set screws, which can be tightened by hand. Downstream from the bar holding the blade guides is one of a pair of horizontal rollers carrying belts which, underneath the rollers, move downstream above and parallel to the conveyor belt. The upper belts slightly compress the buns and are referred to as the "hold down belts." These belts and the conveyor belt propel the buns toward the blade, which slices them.

One witness said the space between the the two bars was "on the order of four inches" wide. Pictures in evidence make the distance appear the width of a bun and one-half. The record contains no exact measurement. McDonald was injured when she reached into this space from above to tighten a wobbling blade guide.

The blade guides consist of half-inch, L-shaped, metal bars. The shorter leg of each blade guide (about six inches long) hangs vertically in the open space referred to, with its upper end attached to the bar. The longer leg is horizontal, and extends downstream between the conveyor belt and the hold down belts. The elbow at the

1. Jurisdiction was based on diversity of citizenship. The parties agree that Indiana law governs substantive questions.

2. No rate of speed is stated. It does appear that approximately 600 to 700 buns a minute go through the machine. Since the buns move in rows of six, at least 100 rows pass through per minute, or almost two rows per second.

angle of the "L" is somewhat rounded. Near the end of the horizontal leg of the blade guides are blade pads through which the blade moves, and which hold the blade steady at the proper height. (Since West Baking made different sized and double-decker buns, sometimes the blade height would be altered, or a second blade added.) At the time of McDonald's injury, the machine had three blade guides, spaced so that as the rows of buns passed them, the blade guides were between the first and second, third and fourth, and fifth and sixth rows of buns.

Not only do the blade guides need adjustment when different sized buns are sliced, but they also tend to become loose during operation and need to be tightened. Tightening is often accomplished without shutting off the machine. Although the testimony was not uniform, it appears there are times when it is necessary to hold the vertical leg steady with one hand, while tightening the screw with the other.

At the time of McDonald's injury, the blade guide was adjusted so that there was about one-half inch space between the conveyor belt and the bottom of the blade guide. The conveyor belt and the hold down belt are about an inch and one-quarter apart, first becoming this close several inches downstream from the elbow of the blade guide. The blade is about fourteen inches downstream from the elbow. There are approximately six inches from the surface of the conveyor belt to the blade guide's set screw.

On the day of the accident, McDonald, who was working on one side of the unit, noticed that one of the blade guides had worked loose. She attempted to tighten it while the machine was running. She asked a co-worker to place her hand in front of the electric eye of the machine which stops the buns from entering the bun slicer (but which does not stop the conveyor belt or blade), stepped onto the frame of the machine, and reached across to tighten the set screw on the blade guide furthest from her. As she testified, "I was tightening [the set screw] with my right hand and holding onto the blade guide with the left hand; and I really don't know, the conveyor belt grabbed me and pulled me right in." Her hand was pulled into the slicer blade and badly cut.

It is unclear exactly what happened. In her deposition, she had testified her left hand was "holding onto the elbow" and her co-worker had testified similarly. At trial, McDonald testified her hand "was on the arm of the blade guide.... It wasn't down on the elbow, but it was in that area." She insisted that she thought she was in a safe position, sufficiently far from the conveyor belt. By hindsight, she had concluded that the side of her hand, or little finger, got caught on the conveyor belt. There is nothing to show whether she was pulled to the blade by contact with the conveyor belt alone, whether her hand was caught between the conveyor belt and the horizontal leg of the blade guide (a one-half inch clearance), or was later caught between the conveyor belt and the hold down belts (a one and one-quarter inch clearance), or by some combination of these factors. The jury could reasonably have believed that she had deliberately placed her hand a safe distance from the belt, but through mischance or inadvertence, it came in contact.

Plaintiff called an expert witness, Dr. Peters, a mechanical engineer and professor of mechanical engineering at Iowa State University. He concluded that the machine is unreasonably dangerous because the entry to the area between the bars "is open so that anyone who is in that area runs the risk of getting a hand caught and pulled right into the blade. There's an enticement to get in there from the design of the blade guide mountings which tend to work loose as a result of vibration; and it's foreseeable in my mind that someone at some time is going to adjust these with the machine running and put themselves in a position where they could very easily get pulled right into the blade and cut." He testified that the danger could feasibly be avoided by a guard over the area, interlocked so that when the guard was removed, the machine would shut off.

He testified further that the blade guide mountings could be designed in a way

which would avoid the need for the type of tightening operation performed by McDonald.

## II. WAS THE DANGER OPEN AND OBVIOUS AS A MATTER OF LAW?

Sandvik argues that the danger of being drawn into the bun slicer and cut by the blade was open and obvious as a matter of law.

Indiana adheres to an open and obvious rule, "stated generally as follows: In the area of products liability, based upon negligence or based upon strict liability under § 402A of the *Restatement (Second) of Torts,* to impress liability upon manufacturers, the defect must be hidden and not normally observable, constituting a latent danger in the use of the product." *Bemis Co., Inc. v. Rubush,* 427 N.E.2d 1058, 1061 (Ind.1981). Whether a danger is open and obvious and whether the danger is hidden are two sides of the same coin. *Bridgewater v. Economy Engineering Co.,* 486 N.E.2d 484, 488 (Ind.1985). Separate determination of the two would be redundant. "Evidence of the open and obvious nature of the danger serves only to negate a necessary element of the plaintiff's prima facie case, that the defect was hidden." *FMC Corp. v. Brown,* 526 N.E.2d 719, 728–29 (Ind.App. 4 Dist.1988).

In a 1985 decision, the Supreme Court of Indiana took pains to correct an interpretation of *Bemis* "that the question of whether an alleged danger is open and obvious is a decision that is always left to the trial court as a matter of law." The Court said it had not so held and that there are cases in which a jury question is presented. *Bridgewater v. Economy Engineering Co.,* 486 N.E.2d 484, 488 (Ind.1985). *See Kroger Co. Sav–On Store v. Presnell,* 515 N.E.2d 538, 543 (Ind.App. 4 Dist.1987); *FMC Corp. v. Brown,* 526 N.E.2d at 724.

■ Sandvik relies on the fact that the fast-moving conveyor belt is clearly visible to a person in McDonald's position, and poses a danger, upon reaching into the space above it to grasp the blade guide, of coming in contact with the conveyor belt. Sandvik would argue that the presence of the hold down belt running only one and one-quarter inches above the conveyor belt is well known to all, even though not as clearly visible, and that the blade, fourteen inches downstream, and not visible, is also known and the danger of being pulled into it recognized.

Several other factors, however, persuade us that the question whether the danger was open and obvious was properly left to the jury.

One factor is the distance of the blade from the visible position of the conveyor belt. Judge Lee, in denying Sandvik's motion for judgment notwithstanding the verdict, emphasized that the blade was fourteen inches away from the area where the conveyor belt was visible. "Thus, this case presents a different situation from, for example, one whose hand is mangled by placing it too close to pinch rollers, *see Estrada v. Schmutz Mfg. Co., Inc.,* 734 F.2d 1218, 1220 (7th Cir.1984), or a person who places a hand inside the chute of a lawn mower, *see Ragsdale v. K–Mart Corp.,* 468 N.E.2d 524, 526 (Ind.App.1984)...." We agree that the present case is distinguishable in this respect from those cases and from others where a danger has been found open and obvious as a matter of law. *E.g., Bemis Co.,* descending metal shroud; *Bryant–Poff, Inc. v. Hahn,* 454 N.E.2d 1223 (Ind.App. 1 Dist.1982), unguarded chain and sprocket; *Miller v. Todd,* 518 N.E.2d 1124 (Ind.App. 2 Dist.1988), absence of crash bar on motorcycle; *Koske v. Townsend Engineering Co.,* 526 N.E.2d 985 (Ind.App. 2 Dist.1988), skinner/slasher machine with eighteen exposed blades.

Another factor is the design of the blade guide mountings which, as noted by Dr. Peters, virtually invite workers to place one hand on the vertical member of a blade guide while tightening the set screw with the other. The set screws (which tended to work loose about twice each shift) were made with knobs, to be tightened by hand. The inconvenience of shutting off the machine and detouring the steady procession of buns discouraged operators from shutting off the machine while tightening the

blade guide. The jury could reasonably find that this design helped disguise the danger.

Finally, the danger was a matter of degree. It seems clearly to have been possible, assuming no inadvertent misplacement or slipping of one's hand, to grasp some portion of the vertical member of a blade guide without contact with the conveyor belt. There is evidence that other workers as well as McDonald (although there is testimony that this was the proper function of lead persons or supervisors) frequently performed the tightening operation while the machine was running. The jury could reasonably find that the workers believed the tightening operation could safely be performed while the machine was running.

"Whether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious." *Kroger,* 515 N.E.2d at 544, *quoting Corbin v. Coleco Industries, Inc.,* 748 F.2d 411, 417–18 (7th Cir.1984); *FMC Corp.,* 526 N.E.2d at 725; and *Koske,* 526 N.E.2d at 992–93.[3]

### III. DEFECTIVE ON DATE SOLD

In order to recover in a product liability suit, the plaintiff must prove that the product's defective condition existed when it entered the stream of commerce. Ind.Code Ann. § 33–1–1.5–3 (Burns 1988 Supp.); *Bemis Co.,* 427 N.E.2d at 1061. Sandvik claims McDonald failed to present any evidence to satisfy this requirement. We disagree.

■ Dr. Peters testified that the P–77 Pillo Pak's main defect was the lack of a

guard over the space between the safety bar and the bar on which the blade guides were mounted, allowing access to the blade guide adjustments while the slicer was running, and exposing the operator to the danger of getting a hand drawn into the slicing blade. He believed that danger was compounded by the design of the blade guide attachments, which allowed the set screws to work loose; the design of the screws, which envisioned manual adjustments; and the machine's open frame, which allowed a worker to step onto the machine to tighten the set screws.

It seems clear that the evidence would support a jury finding that the same defect had been present when the machine was sold. Dr. Peters compared the manufacturer's blueprints with the machine he observed in 1987. He described the changes he observed, but did not regard them as significant. They were a change at the downstream end of the blade guides, and the welding on of a T-handle in place of a knob for turning the set screws. Sandvik's witness, Mr. Weaver, had designed the machine. He produced pictures of it taken shortly before shipment. They showed there was no guard over the blade guide adjustment area. He described three changes: (1) the set screws originally had knobs; (2) there were originally two blade guides instead of three; and (3) the blade guides in use at the time of the accident had been manufactured by someone else. There was no testimony that any of these changes made a difference in the condition which Dr. Peters considered a defect. Sandvik does, however, argue that the change to three blade guides required McDonald to stretch farther in order to reach the furthest of three than to reach the further of two.

■ In its reply brief, Sandvik points to Dr. Peters' testimony at trial in 1987 that

---

**3.** In the absence of a decision by the state's highest court, an intermediate state court's decision is authoritative, "unless there is 'good reason to believe that the state's highest court would reject' the decision of the intermediate court." *Peeler v. Village of Kingston Mines,* 862 F.2d 135, 137–38 (7th Cir.1988) *quoting Phelps v. Sherwood Medical Industries,* 836 F.2d 296, 306 (7th Cir.1987); *see Hicks on Behalf of Feiock v. Feiock,* 485 U.S. 624, 108 S.Ct. 1423, 1428–29 n. 3, 99 L.Ed.2d 721 (1988) *quoting West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 237–38, 61 S.Ct. 179, 183–84, 85 L.Ed. 139 (1940). We find no "good reason" to think the Indiana Supreme Court would reject these decisions.

he found the absence of a guard not consistent with appropriate design principles he has "exercised over 30 years of experience." Sandvik suggests the possibility of interpreting that testimony to the effect that these principles had been developing over 30 years, and professes to find a fatal gap because Peters didn't say he would have applied the same principles in 1979 at the time of sale as he did at the time of trial. We conclude, however, that the testimony can be fairly interpreted as meaning that the principles referred to remained constant over the 30 years. If Sandvik needed clarification, its counsel could have inquired.

## IV. INCURRED RISK

■ Sandvik next claims that McDonald was barred from recovery because she incurred the risk of being injured. In Indiana, it is an affirmative defense to a product liability suit "that the user or consumer bringing the action knew of the defect and was aware of the danger and nevertheless proceeded unreasonably to make use of the product and was injured by it." Ind.Code Ann. § 33–1–1.5–4 (Burns 1988 Supp.). Unlike the "open and obvious danger" principle, the defense of incurred risk is subjective, turning on the plaintiff's actual knowledge and acceptance of a specific risk. *Beckett v. Clinton Prairie School Corp.*, 504 N.E.2d 552, 554 (Ind. 1987).

■ Incurred risk can be found as a matter of law only if the evidence is without conflict and the sole inference to be drawn is that the plaintiff had actual knowledge of the risk, and understood and appreciated that risk. *Stainko v. Tri-State Coach Lines, Inc.*, 508 N.E.2d 1362, 1365 (Ind.App.1987).

■ As already noted, McDonald testified that she thought her hand was in a safe position, sufficiently far from the conveyor belt. The jury could reasonably have found that it was only by inadvertence that her hand came close enough to the belt to be caught by it. Incurred risk was a jury question.

## V. DENIAL OF MOTION FOR NEW TRIAL

Sandvik claims it merits a new trial because of error in instructions and admission of certain testimony by Dr. Peters.

### A. Jury Instructions

■ The principal theories of Sandvik's defense were that the danger of having one's hand drawn into the blade was open and obvious and that in any event, McDonald incurred the risk. The court adequately instructed on both propositions. Sandvik complains of the court's failure to give several instructions it requested on these subjects. The requested instructions would have been repetitive. Refusal of instructions on a party's theory of the case is not reversible error if the instruction given adequately presents the party's theory. *Mann v. Anderson*, 447 F.2d 533, 537 (7th Cir.1971).

■ Several of the instructions requested by Sandvik were phrased, as was the instruction given by the court, in terms of open and obvious danger. Several of the other requests were phrased in terms of hidden and unknown danger, not normally observable. As stated earlier, whether a danger is open and obvious and whether the danger is hidden are two sides of the same coin, and separate determination of the two would be redundant. *Bridgewater*, 486 N.E.2d at 488 and *FMC Corp.*, 526 N.E.2d at 728–29.

Sandvik also challenges a portion of the instruction which the court did give on the open and obvious danger requirement. The instruction read as follows:

A seller or manufacturer of a product cannot be held liable for defects which are open and obvious, that is, defects known to the plaintiff, or which in the exercise of reasonable care should have been known to the plaintiff. Whether a defect is open and obvious is an objective test, based upon what the user should have known. *Whether a danger is open and obvious depends not just on what people can see with their eyes, but also on what they know and believe about*

*what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in a way generally believed to be safe is not open and obvious.* There-fore, if you find the plaintiff sustained an injury by reason of a condition of a prod-uct which was open and obvious, then the defendant is not liable to the plaintiff for said condition.

(Emphasis added.)

We have italicized the portion of the in-struction to which Sandvik particularly ob-jects. This language first appeared in a decision of this court, *Corbin v. Coleco Industries, Inc.*, 748 F.2d 411, 417–18 (7th Cir.1984). It has, however, been quoted with approval by the Court of Appeals of Indiana, Fourth District, in *Kroger Co. Sav–On Store v. Presnell*, 515 N.E.2d 538, 544 (Ind.App. 4 Dist.1987) and *FMC Corp. v. Brown*, 526 N.E.2d 719, 725 (Ind.App. 4 Dist.1988), and apparently approved by the Second District in *Koske v. Townsend En-gineering*, 526 N.E.2d 985, 991–93 (Ind. App. 2 Dist.1988).[4]

▉ Judge Lee had correctly instructed that "[w]hether a defect is open and obvi-ous is an objective test, based upon what the user should have known." Sandvik argues that the reference to what people generally believe introduces a "subjective test" and improperly expands the class to be protected from users (and consumers) of the product to include all people.

Judge Lee, in ruling on motions after verdict, found the difference in meaning between "people" and "user or consumer" negligible in this context. He also pointed to his explicit statement that the test is objective, coming immediately before the language derived from *Corbin.*.

We think that a standard of what people generally believe *is* objective in nature. Whatever the semantic problem in refer-ring to "people generally" rather than "a reasonable person in the position of a user" or some similar verbiage, we see no danger

in this case that the jury was misled nor the defendant prejudiced.

▉ Finally, Sandvik argues that the court erred when it refused to give Sand-vik's requested Instruction No. 31. Judge Lee instructed the jury that it was plain-tiff's burden to prove that there had been no substantial change from the condition of the machine when defendant sold it. This instruction covered the first sentence of No. 31. The requested instruction went on: "By substantial change, I mean any change which increases the likelihood of a malfunc-tion which is the proximate cause of the harm complained of, and which is indepen-dent of the expected and intended use to which the product is put."

This case concerned a defect in design, not a malfunction, and the quoted language did not fit. Had it been given, the jury may have been confused. In ruling on motions after verdict, Judge Lee indicated that the instruction given was adequate without further elaboration, and we agree.

*B. Alleged Improperly Admitted Evi-dence*

Sandvik challenges the admission of two pieces of evidence.

(1) Dr. Peters' Observation in 1981

▉ Over Sandvik's objection, Dr. Pe-ters was permitted to testify that in De-cember, 1981 he had told representatives of the manufacturer that there was a defect in the machine because it was not guarded over the top area of the blade guide adjust-ment. He had also told of his concerns about the fact that someone would be able to get into the blade guide area to adjust it and could slip or get caught in the convey-ors.

There had been a lengthy hearing in the absence of the jury. The background facts shown at the hearing, but which were not made known to the jury, were that in other litigation Dr. Peters had examined a differ-ent model (P–72), on which someone had been injured, and had stated his opinions by deposition. The P–72 differed from the

4. *See* n. 3, *supra.*

P–77 in several aspects, but was similar in not having a guard which would prevent a worker from tightening a blade guide while the machine was running. At the close of the hearing Judge Lee found the circumstances and machines sufficiently similar; that the evidence was relevant; and that the probative value outweighed the prejudicial impact. We find no abuse of discretion.

**(2) Dr. Peter's Observation of a Worker in 1987**

 Dr. Peters was permitted to testify that when he visited the baking company in January, 1987, he "saw an adjustment being made to the machine while the machine was in operation in the blade guide support area." This testimony had been considered at the same hearing out of the presence of the jury. Judge Lee found the testimony admissible, saying, "I think it clearly shows the foreseeability that workmen would do that. It supports Dr. Peters' testimony that this is a design defect, and also it tends to defeat the defense ... that this is an open and obvious hazard." He found it relevant, and that its probative value outweighed its prejudicial impact. Again, we find no abuse of discretion.

The judgment appealed from is AFFIRMED.