Kimberly ANDERSON, Personal Representative of the Estate of Terry Joe Anderson, Deceased, Plaintiff–Appellant,

v.

P.A. RADOCY & SONS, INCORPORATED and Miller Electric Manufacturing Company, Defendants–Appellees.

No. 94–3612.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1995.

Decided Sept. 29, 1995.

Robert O. Vegeler, (argued), Beers, Mallers, Backs & Salin, Fort Wayne, IN, for Kimberly Anderson.

Larry L. Barnard, (argued), Edward L. Murphy, Jr., Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, for P.A. Radocy & Sons, Incorporated.

James L. Peterson, (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Miller Electric Manufacturing Company.

Before POSNER, Chief Judge, RIPPLE, Circuit Judge, and NORGLE, District Judge.*

NORGLE, District Judge.

Terry Anderson was electrocuted on November 19, 1991, while repairing a commercial sign. Through personal representative Kimberly Anderson, his Estate (the "Estate") filed a six count amended complaint against four Defendants—P.A. Radocy & Sons, Inc. ("Radocy"), Miller Electric Manufacturing Company ("Miller"), Waldrum Sign Company ("Waldrum"), and James W. Cunningham, Bankruptcy Trustee for Waldrum. Radocy and Miller filed motions for summary judgment which the District Court granted on September 15, 1994. Anderson's Estate appealed. We affirm.

I.

Burkhart Advertising initially hired Terry Anderson as a serviceman. After four years of on the job training, he became a journeyman sign electrician with Burkhart in 1990 and was employed in that position on the date of his death. As a result of his experience, Anderson had a working knowledge of electricity.

On November 19, 1991, Anderson and Scott West, a co-worker and fellow journeyman sign electrician, arrived at a Builders Square store in Fort Wayne, Indiana, at approximately noon to repair the store's main commercial sign. The men used a sixty-five foot Radocy crane with a metal basket attached. The Radocy crane was installed atop a Ford truck. Permanently housed within the body of the truck was an electric generator manufactured by Miller which was used as an auxiliary power source for welding and sign repair. West was aware that the basket was metal and that the crane was not insulated. West was also aware that the generator had no ground fault interrupter ("GFI").[1]

---

* The Honorable Charles R. Norgle, Sr., United States District Judge for the Northern District of Illinois, sitting by designation.

1. A GFI is a device which shuts off electricity when it senses an imbalance in the circuit caused by leakage to ground. The Occupational Safety and Health Administration published a booklet concerning the use of a GFI (which they refer to as a GFCI) in which it describes the mechanics of the device:

> The GFCI continually matches the amount of current going to an electrical device against

the amount of current returning from the device along the electrical path. Whenever the amount "going" differs from the amount "returning" by approximately 5 milliamps, the GFCI interrupts the electric power within as little a 1/40 of a second. However, the GFCI will not protect the employee from line-to-line contact hazards (such as a person holding two "hot" wires or a hot and a neutral wire in each hand).

*Ground–Fault Protection on Construction Sites,* OSHA 3007, reprint 1990. A GFI is required for

Using the Miller generator as a power source for the sign, Anderson and West determined which section of the sign was unlighted and in need of repair. The men hypothesized that the malfunction was due to a short circuit in the sign's electrical system. Consequently, Anderson boarded the metal basket to inspect the sign. After Anderson removed the side trim and half of the bottom trim from the sign, he began to dismantle the sign's face. As he did, he received an initial shock of electricity. Anderson told West that he had just been shocked. West then disconnected the Miller generator from the sign.

Once Anderson believed that he had completed the repairs, West reconnected the sign to the Miller generator. The men noted that all of the lamps on the sign were properly lit and that the sign appeared to be functioning normally. Thereafter, still standing in the metal basket attached to the non-insulated crane, Anderson reached into the sign, presumably to retrieve his tools, and was electrocuted.

The Estate brought suit against Miller as the manufacturer of the generator and Radocy as the manufacturer of the crane and metal basket. The claims were premised on theories of negligence and strict liability in tort. On Defendants motion for summary judgment, the District Court held that there were no material issues of fact in dispute and found in favor of Miller and Radocy.

On appeal, the Estate raises two issues.[2] First, the Estate argues that Indiana's open and obvious danger rule does not bar the negligence claims because they are governed by Indiana's Comparative Fault Act, which does not expressly recognize this defense. Second, the Estate argues that either the crane or the generator was in a defective condition and unreasonably dangerous; thus,

the trial court should not have dismissed the strict product liability claims.

## II.

■ We review a district court's grant of summary judgment *de novo*. *Green v. Shalala*, 51 F.3d 96, 99 (7th Cir.1995). A grant of summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not a remedy to be exercised at the court's option; it must be granted when there is no genuine dispute over a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, then summary judgment will not lie. *Id.*

### A.

■ The first issue is whether Indiana's open and obvious danger rule proscribes the Estate's negligence claims. The open an obvious danger rule bars assessing liability against a manufacturer in product cases based on negligence where defects are latent and normally observable. *Welch v. Scripto–Tokai Corp.*, 651 N.E.2d 810, 814–15 (Ind. App.1995). The appellate court in *Schooley v. Ingersoll Rand, Inc.* reiterated the test for determining whether a danger is open and obvious: "[T]he defect must be hidden and not normally observable, constituting a latent danger in the use of the product." 631 N.E.2d at 938 (quoting *Bemis Co. v. Rubush*, 427 N.E.2d 1058, 1061 (Ind.1981)). In exam-

certain outlets on construction sites. *See* 29 CFR § 1926.404(b)(ii). However, "[r]eceptacles on a two-wire, single-phase portable or vehicle-mounted generator rated not more than 5kw, where the circuit conductors of the generator are insulated from the generator frame and all other grounded surfaces, need not be protected with ground-fault circuit interrupters." *Id.; see also National Electric Code 1993*, article 305–6(a). Miller contends that its generator matches this exception.

2. At oral argument, the Estate raised as a third issue whether Radocy and Miller may avoid liability for failing to equip its products with a GFI because the employer knowingly rejected the option. We need not reach this point because we find that Defendants are not liable on other grounds.

ining whether a given danger is open and obvious, the court employs an objective test based on what the reasonable consumer would have known. *Id.* at 939. However, "if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious." *McDonald v. Sandvik Process Sys., Inc.*, 870 F.2d 389, 394 (7th Cir.1989) (quoting *Kroger Co. Sav-On Store v. Presnell*, 515 N.E.2d 538, 544 (Ind.Ct.App.1987)).

The parties recognize that Indiana law does not apply the common law open and obvious rule to strict liability claims lodged under Indiana's Strict Product Liability Act. Ind.Code § 33–1–1.5–4(b)(1); *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 442 (Ind. 1990) (noting that the rule is not listed as an available defense under the Act); *Miller v. Todd*, 551 N.E.2d 1139, 1143 (Ind.1990); *see also Traylor v. Husqvarna Motor*, 988 F.2d 729, 731 (7th Cir.1993) (explaining that the Indiana legislature replaced the defense of open and obvious danger with the codified defense of incurred risk). However, the parties dispute whether the open and obvious danger rule may be used as a defense to product claims based on negligence.

■ Due to the enactment of Indiana's Comparative Fault Act, Ind.Code § 34–4–33–1 *et seq.*, the Estate argues, the common law defense of open and obvious danger no longer exists. The Estate reasons that when the doctrine of contributory negligence (which completely barred a plaintiff's cause of action if the plaintiff were even slightly at fault) was abandoned with the enactment of the Comparative Fault Act, so too were the common law doctrines whose purpose was only to ameliorate the harshness of contributory negligence. *See generally Roggow v. Mineral Processing Corp.*, 894 F.2d 246 (7th Cir. 1990) (discussing the viability of the doctrine of last clear chance in Indiana, yet not taking a position given the facts of the case); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 67, at 477 n. 82 (5th ed. 1984) (citing a dozen jurisdictions that have abolished the doctrine of last clear chance after adopting comparative fault).

The Comparative Fault Act does not apply to actions which accrued before January 1, 1985. Ind.Code § 34–4–33–1. The seminal Indiana Supreme Court cases which discuss the open and obvious danger rule and involve product liability issues arise out of claims that accrued before January 1, 1985. Nevertheless, each of those cases suggests that the rule survives as to product liability claims based on negligence. *See Miller*, 551 N.E.2d at 1143 (upholding the trial court's entry of summary judgment on the grounds that the alleged defect was open and obvious); *Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 938 (Ind.Ct.App.1994) (relying on *Bemis Co. v. Rubush*, 427 N.E.2d 1058 (Ind.1981), *Koske*, and *Miller*, the court generally pronounced that Indiana's open and obvious danger rule is applicable in product cases based on negligence).

Moreover, three Indiana product cases decided by the intermediate level state appellate courts involve claims which accrued after the Comparative Fault Act took effect and further indicate the rule is alive. In *Rogers v. R.J. Reynolds Tobacco Co.*, 557 N.E.2d 1045 (Ind.Ct.App.1990), the plaintiff's decedent died after January 1, 1985. Although the court found the rule not applicable to those facts, the court cited *Koske* for the proposition that the rule is still applicable to claims based on negligence. *Id.* at 1052. In *Moore v. Sitzmark Corp.*, 555 N.E.2d 1305 (Ind.Ct.App.1990), the plaintiff broke her leg skiing in January 1986. The *Moore* court wrote that the open and obvious danger rule applies to product claims based on negligence because the *Koske* decision only proscribed the rule's use under the Strict Product Liability Act.[3] *Id.* at 1309 n. 5. More recently, in *Welch v. Scripto–Tokai Corp.*, 651 N.E.2d 810, 814–15 (Ind.Ct.App.1995), a small child burned himself with a cigarette lighter in 1988 and filed a product claim based on negligence. Expressly employing the open

---

**3.** The *Koske* decision itself provided the following in a footnote: "The present case is predicated upon liability theories of willful or wanton misconduct and product strict liability. The issues presented on appeal do not seek evaluation of whether the court-created open and obvious danger rule should be retained in product negligence liability cases." *Koske*, 551 N.E.2d at 443 n. 4.

and obvious danger rule, the court upheld dismissal of the negligence claim.

In addition, the rules of statutory construction decree that courts interpret statutes as not altering a state's common law beyond that which the legislature declared in express terms or intended unmistakably. *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, 578 N.E.2d 669, 673 (Ind.1991); *McGraw–Edison Co. v. Northeastern Rural Elec. Membership Corp.*, 647 N.E.2d 355, 359 (Ind.Ct.App.1995). The Indiana legislature did not expressly abrogate the open and obvious danger rule, and, as noted *supra*, the state's lower courts have continued to apply it. Accordingly, the open and obvious danger rule may be raised to defeat a product claim based on negligence.[4] Thus, if we find the alleged danger in the instant case to be open and obvious, we must find that the district court did not err.

### B.

■ We next examine how the rule applies to the facts of this case. The Estate argues that the district court erred in applying the open and obvious danger rule. Under Indiana law, "summary judgment based on an open and obvious danger is proper ... only if 'from the uncontested facts no reasonable jury properly instructed in Indiana law could infer that the danger was not open and obvious.'" *Ruther v. Robins Eng'g & Constructors*, 802 F.2d 276, 278 (7th Cir.1986) (quoting *Estrada v. Schmutz Mfg. Co.*, 734 F.2d 1218, 1220 (7th Cir.1984)); *see generally Phillips v. Cameron Tool Corp.*, 950 F.2d 488, 491 (7th Cir.1991). There is a presumption against granting summary judgment on the basis of the open and obvious danger rule in Indiana.

■ In its brief, the Estate concedes that both West and Anderson realized the metal basket and metal crane arm would not provide them protection from an electrical shock. In addition, West testified that he was aware that the generator did not have a GFI, and there is no evidence to suggest that Anderson was not also aware. The resulting issue is whether the danger of working on a highly charged electrical sign with the combination of the three products was openly and obviously dangerous. The trial court concluded that it was, and we agree. From an objective standpoint, reasonable journeymen electricians would be aware of the hazards associated with a noninsulated crane, metal basket, and generator without a GFI. That the tools in question were not neophyte-safe does not mean that the tools were unreasonably dangerous. Instead, reasonable journeymen electricians would recognize that the tools must be used with a certain degree of caution. Anderson and West used caution when they disengaged power from the sign once Anderson had experienced the first shock. After Anderson received that shock, the power was cut and Anderson worked on the sign without incident. The precaution of disengaging power from the sign illustrates that the men were aware that electricity could surge through the system. It was only after Anderson believed he had repaired the sign that power was again engaged. Unfortunately, Anderson was mistaken in believing that he had repaired the sign. Without precautions, he reached for his tools and was electrocuted. The alleged danger surrounding the products was open and obvious.

The case of *Ruther v. Robins Eng'g and Constructors*, 802 F.2d 276 (7th Cir.1986) is similar but may be distinguished. In *Ruther,* the basement of a bedding plant contained a vibrating feeder as part of a system constructed to make sinter. When the vibrating feeder malfunctioned, four employees investigated. Hot flue dust, a by-product from air pollution devices on plant chimneys, was airborne in the basement. As the employees entered the basement to inspect, the men encountered a large amount of hot flue dust. The men inspected the equipment, then left the basement to check for a malfunction in a control room. Thereafter, two employees reentered the basement in an attempt to fix the vibrating feeder. After an hour and a

---

**4.** The Estate mistakenly stated that a negligence claim may be brought under the Strict Product Liability Act. (Br. of Appellant at 26.) Indiana's Strict Product Liability Act does not govern ac-

tions in which the alleged theory of liability is negligence. *Reed v. Central Soya Co.*, 621 N.E.2d 1069, 1071 n. 1 (Ind.1993); *see also Miller,* 551 N.E.2d at 1143; *Koske,* 551 N.E.2d at 442 n. 2.

half, one employee left the basement complaining that he could not breathe. The worker who remained in the basement died that day; the worker who left died the next day. We noted that the decedents had often made electrical checks in that basement while the system was running without incident. Furthermore, as part of the analysis, the plaintiff was quoted with approval as arguing, " '[c]ertainly, none [of the four employees] would have been bent on suicide.' " *Id.* at 279. We reversed the district court finding that a reasonable juror could infer that the danger of fatality was not open and obvious.

The case of *McDonald v. Sandvik Process Systems,* 870 F.2d 389 (7th Cir.1989) is also distinguishable. There we found, as a matter of law, that the product in question was not openly and obviously dangerous. *Id.* at 393. The *McDonald* plaintiff was hired to inspect freshly made hamburger buns as they moved along a conveyor belt before the buns were sliced and packaged. As the plaintiff attempted to tighten a wobbling blade guide, while the conveyor belt was in motion, the plaintiff's hand was pulled into the slicer blade by the conveyor belt and was badly cut. One of the three factors considered in finding against applying the open and obvious doctrine was the degree of danger involved. The employees believed that the tightening operation in question, although marginally dangerous, could be completed safely while the conveyor belt was in motion; indeed the plaintiff and other employees had performed this operation previously. We concluded that a jury could reasonably find that the employees generally believed it was safe to execute the tightening operation while the machine was running. As the district court recognized, the *McDonald* plaintiff's argument was not that she was aware of the alleged defect and its danger; rather she asserted that she reasonably believed the blade guide could be fixed without exposing herself to danger. Therefore, the alleged defect was not open and obvious.

In the case at bar, the evidence reveals that the fatal danger involved, not the products alone, but the combination of the products with a highly charged defective electri-

cal sign. We recognize that, as in *Ruther,* Anderson was not bent on suicide. However, here, Anderson was aware that both caution and certain precautions were necessary to complete safely the repair of the sign, whereas the *Ruther* decedents were not aware that the danger was fatal. Regarding *McDonald,* we reasoned that the danger in question was latent due to the makeshift practice of having to work around the danger. Here, the danger attributed to the Radocy crane and the Miller generator was not a danger to be worked around, but a recognized condition whose potential harm could have been avoided (and was avoided when the power was disengaged) with the correct precautions. In *McDonald,* it did not appear dangerous to complete the tightening operation on the wobbling blade guide. Whereas, journeymen electricians would be well aware, as were Anderson and West, that the products in question, if used in conjunction with a defective commercial sign, could conduct a fatal amount of electricity. Accordingly, the district court did not err in applying the open and obvious danger rule to grant summary judgment against the Estate's negligence counts.

### C.

■ The next issue is whether the district court erred when it granted summary judgment against the Estate's design defect claims. Indiana's Strict Product Liability Act provides as follows:

> One who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to his property is subject to liability for physical harm caused by that product to the user or consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:
>
> (1) the seller is engaged in the business of selling such a product; and
>
> (2) the product is expected to and does reach the user or consumer without substantial alteration in the condition in

which it is sold by the person sought to be held liable under this chapter.

Ind.Code § 33–1–1.5–3(a). A product is in a defective condition where (1) the condition is not reasonably contemplated by the expected user of the product, and (2) the condition will be unreasonably dangerous to the expected user when the product is handled or consumed in foreseeable ways. Ind.Code § 33–1–1.5–2.5(a). Lastly, Indiana statutorily defines the term unreasonably dangerous in a product as that which "exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind.Code § 33–1–1.5–2.

Regarding design defects specifically, we have recently stated that:

Indiana's definition of "defect" is similar to what is commonly referred to as the consumer expectation test: a product is in a defective condition if the condition is not contemplated by the reasonable consumer and the condition is unreasonably dangerous to the expected user. Ind.Code § 33–1–1.5–2.5. "The requirement that a product be in a defective condition focuses on the product itself; whereas, the requirement that the product be unreasonably dangerous focuses on the reasonable contemplations and expectations of the consumer." *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 685 (Ind.Ct.App. 1991) (holding that, under Ind.Code § 33–1–1.5–3(a), both elements must exist to attach liability). We have said, concerning the legal definition of defect, "The question is not whether it is 'possible' for something untoward to occur during an accident but whether 'the design creates unreasonable

danger' according to 'general negligence principles.'" *Pries v. Honda Motor Co.*, 31 F.3d 543, 545 (7th Cir.1994) (citing *Miller*, 551 N.E.2d at 1141). Essentially, the standard for defects has devolved into a negligence test.

*Whitted v. General Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir.1995). We reiterate that Indiana has codified the consumer expectation test. *See* Ind.Code § 33–1–1.5–2. Therefore, except for crashworthiness cases, Indiana does not subscribe to the risk-utility test.[5]

Essentially, the Estate contends that both Anderson and West, reasonable consumers, did not perceive that electrocution was a possibility. Again, the Estate concedes that both men understood that the metal crane and basket would not provide protection from electrical shock. Yet, it is maintained that the men did not know a fatal electric shock could result by the electricity grounding through the tires or the generator. *Cf. Hamilton v. Roger Sherman Architects Group*, 565 N.E.2d 1136 (Ind.Ct.App.1991) (holding that where the greater injury is only matter of degree, a plaintiff may not argue that she was not aware of the exact injury). The question becomes whether the difference between an electrical shock and electrocution is one of kind or degree. We answer that the difference is one of degree.

Anderson experienced an initial shock of electricity while standing in the metal basket attached to the steel crane. He was aware that an amount of electricity could surge through his person. The fact that a fatal amount of electricity surged through him is a matter of degree, not a matter of a completely different injury.

In addition, focusing on the condition of the products and the reasonable expectations

---

**5.** For crashworthiness cases, the Indiana Supreme Court has carved out an exception to its statutory definition of "unreasonably dangerous" and requires a risk-utility analysis. *See Pries v. Honda Motor Co.*, 31 F.3d 543, 546 (7th Cir. 1994). In *Pries*, we noted that "Indiana requires the plaintiff to show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *Id.* However, the requirement that the plaintiff, in order to establish a defective condition, must offer a more cost-effective design ap-

plies to enhanced injury cases only. *See Miller*, 551 N.E.2d at 1143 (examining the concept of defective condition "from a crashworthiness standpoint"). Recently, in *Welch v. Scripto–Tokai Corp.*, a case which did not involve crashworthiness, an Indiana appellate court reiterated that, although the feasibility of creating a safer design may affect a consumer's expectations, the feasibility itself is only a factor in the codified consumer expectation test. 651 N.E.2d at 815 n. 5. The fact that a product could have been designed safer does not establish liability. *Id.*

of the consumer, we cannot find that " 'the design creates [an] unreasonable danger' according to 'general negligence principles.' " *Pries,* 31 F.3d at 545 (citing *Miller,* 551 N.E.2d at 1141). Both West and Anderson were journeymen electricians, and both had a working knowledge of electricity. The men were aware that short circuited commercial signs could be dangerous. It was their job to fix such signs. In so doing, as they had done before, the men used a non-insulated crane with a metal basket and a generator without a GFI.[6] The job requested of them was dangerous; yet, the tools they used to complete the job did not make the tools themselves unreasonably dangerous. The fact remains that the tools could have been used in a manner that would provide safety—by disengaging all power from the sign. The relative conditions of the Radocy crane and Miller generator (i.e., the absence of a GFI, a non-insulated crane, and a metal basket) would have been known by the expected users of the products. Accordingly, the products were not in a defective condition.

### III.

In sum, there is no genuine issue of material fact to be decided. The district court correctly granted summary judgment against the Estate's claims based on both the negligence and strict product liability theories. The issue of proximate cause and defective warning need not be addressed. *See Bemis Co. v. Rubush,* 427 N.E.2d 1058, 1061 (holding that a manufacturer has "no duty to warn if the danger is open and obvious"); *Welch,* 651 N.E.2d at 815. We affirm.

---

**6.** Approximately 85% of the signs Burkhart Advertising were hired to fix were electrical, and all three cranes in its sign division had metal baskets, had non-insulated boom arms, and lacked GFIs.