**Dolores MOSS and Larry Moss, Plaintiffs,**

v.

**CROSMAN CORPORATION and K-Mart Corporation, Defendants.**

**Cause No. 3:95–CV–425RM.**

United States District Court, N.D. Indiana, South Bend Division.

Sept. 9, 1996.

---

Frank E. Tolbert, Miller Tolbert Muehlhausen Muehlhausen and Groff, Logansport, IN, Edmond W. Foley, Foley and Small, South Bend, IN, Hugo A. Bamberth, Hugo A. Bamberth Law Office, LaPorte, IN, for Dolores Moss and Larry Moss.

Timothy J. Abeska, Roemer and Mintz, South Bend, IN, Steven E. Danekas, Wildman Harrold Allen and Dixon, Chicago, IL, for Crosman Corporation, Coleman Company, Inc. and Kmart Corporation.

Frederick B. Ettl, South Bend, IN, for the Children's Campus, Inc.

## MEMORANDUM AND ORDER

MILLER, District Judge.

The court has jurisdiction over this suit under 28 U.S.C. § 1332 because of the parties' diverse citizenship, and Indiana law provides the rule of decision. The defendants seek summary judgment on the plaintiffs' claims, and request oral argument on their motion. The parties' briefs sufficiently inform the court of their respective arguments, and the court denies the motion for oral argument. As explained in greater detail below, the present state of Indiana law does not support the plaintiffs' claims, and there is no basis upon which to predict a change in Indiana law that would allow the plaintiffs to prevail. Accordingly, the court grants the defendants' motion for summary judgment.

## I. BACKGROUND

This case arises from the death of Joshua Moss ("Josh"), the seven-year old son of plaintiffs Dolores and Larry Moss, on September 28, 1993. His death resulted from a shot fired by his cousin, Timothy Arnett ("Tim"), then 11 years old, with the Crosman 760 Pumpmaster airgun Josh's father bought for him at K-Mart just ten days before. Tim and Josh were firing the airgun at pop cans without supervision in Tim's backyard when the fatal shooting occurred. Tim was convicted of criminal recklessness and sentenced to home detention as a result of the shooting. The Mosses brought this suit against Crosman, Coleman Company, Inc.,[1] and K-Mart, asserting a strict products liability claim and a claim for emotional damages the Mosses suffered as a result of their son's death against all defendants, and a claim for punitive damages against defendant Crosman for its alleged reckless disregard of its duties.

Pursuant to N.D.Ind.L.R. 56.1, Crosman and K-Mart submitted a statement of material facts, and the Mosses submitted a statement of genuine issues "setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." The genuine issues the Mosses contend exist are: (1) whether the airgun was defective and unreasonably dangerous because it was needlessly powerful and because its warnings were inadequate; (2) whether the plaintiffs are entitled to recover emotional distress damages (this, the Mosses concede, is a matter of law for the court to decide, though a jury must decide the nature and extent of those damages); and (3) whether there is clear and convincing evidence entitling the plaintiffs to punitive damages in this case.

The Mosses' statement of genuine issues does not contend that a genuine issue as to any of the facts set forth in the defendants' statement exists. Pursuant to Local Rule 56.1, the court assumes the truth of those facts to the extent they are supported by admissible evidence. The following facts are drawn in large part from the defendants' statement of material facts.

Josh's father Larry had a broad exposure to firearms and BB and pellet guns. He knew that a BB gun or pellet gun could put a person's eye out, or kill a bird at close range. His sons, Josh and Josh's brother, Larry Lee (aged 14 in 1993), were exposed to firearms when they were each 4 or 5 years old. Larry told his sons not to point or shoot BB guns at people, and not to shoot at anything that could ricochet a BB back at him. Larry did not want Josh and his cousin, Miles Bolze, to

---

1. By stipulation of the parties, Coleman Company, Inc. was dismissed from the case on August 8, 1995.

shoot at each other because everyone knows, or should know, that a BB can put an eye out.

Josh first asked for a BB gun about a month before the September 1993 shooting incident. Larry and Dolores were divorced in August 1993, and discussed the purchase of a BB gun for Josh some time after that. Dolores thought Josh was too young to have a BB gun. On September 18, however, Larry and Josh were shopping in the LaPorte K–Mart with Larry's step-daughter and her son, and Larry bought Josh the Crosman 760 Pumpmaster airgun after Josh cried and "threw a fit". Josh said he wanted the Crosman 760 Pumpmaster, and Larry gave him the money to purchase it.

Larry testified in his deposition that he saw only the warning on the box that said "May cause death or injury," but that he shrugged it off, thinking, "What are they talking about" and maybe they meant a bird or a small animal. The 760 Pumpmaster's box had the following warnings, none of which Larry read: "NOT A TOY"; "ADULT SUPERVISION REQUIRED"; "THIS AIRGUN IS INTENDED FOR USE BY THOSE 16 YEARS OF AGE OR OLDER."; "FOR COMPLETE OPERATING IN-STRUCTIONS, REVIEW OWNERS MANUAL INSIDE BOX BEFORE USING THIS AIRGUN." Larry testified that he would have purchased the airgun even if the salesperson had told him that it could kill a human.

Larry also testified that a plastic bag containing papers came out of the box when the gun was removed. Larry did not open the bag or read the papers or review them with Josh; he put them back in the box and stored the box behind his dresser. The bag contained a bright yellow document titled "A SPECIAL MESSAGE TO PARENTS", a "SHOOTING FOR SAFETY" pamphlet, a registration form, and the owner's manual. The first page of the owner's manual states: "And remember, the Model 760 Pumpmaster is not a toy. Treat it with the same respect you would a firearm. Always carefully follow the safety instructions found in this owner's manual." The warnings on the outside of the airgun's box are reprinted on the second page of the owner's manual in red print:

> WARNING: NOT A TOY. ADULT SUPERVISION REQUIRED. MISUSE OR CARELESS USE MAY CAUSE SERIOUS INJURY OR DEATH. MAY BE DANGEROUS UP TO 475 YARDS (435 METERS).
> READ ALL INSTRUCTIONS BEFORE USING.

\* \* \* \* \* \*

> THIS AIRGUN IS INTENDED FOR USE BY THOSE 16 YEARS OF AGE OR OLDER.

The "SPECIAL MESSAGE TO PARENTS" flyer states in part: "This airgun or air-rifle IS NOT A TOY. Personal injury or death can result from improper handling if pellet strikes someone in a vulnerable spot. Treat this airgun or air-rifle with the same caution as a real firearm." The following message is printed on airgun itself, above the trigger:

> WARNING: Before using, read owner's manual available free from Crosman Air Guns E. Bloomfield, NY USA 14443

At his deposition, Larry was asked about the effect, if any, some of the warnings he did not see would have had on his decision to buy the gun and the way in which he allowed Josh to use the gun. When asked whether seeing the "ADULT SUPERVISION REQUIRED" or "MAY BE DANGEROUS UP TO 475 YARDS" warnings would have influenced his decision to buy the airgun, Larry responded "Maybe, I don't know." He stated that if he had seen "Not a toy" or "THIS AIRGUN IS INTENDED FOR USE BY THOSE 16 YEARS OF AGE OR OLDER" that it would not have influenced his decision to buy the airgun.

Larry answered "Maybe, I don't know" when asked whether seeing the four warnings above would have influenced his decision regarding when and how Josh could use the airgun. Larry also answered "Maybe, I don't know" when asked whether seeing the following sentences would have influenced his decision on when and how Josh could use the airgun: "Treat it with the same respect you would a firearm."; "Please be sure they operate it under the supervision of an adult";

and "Personal injury or death can result from improper handling if a pellet or BB strikes someone in a vulnerable spot." Dolores testified that she did not read anything on the airgun's box or any of the papers that came with it.

When Larry and Josh returned home from K–Mart after purchasing the airgun, Josh wanted to use it right away, so they went in the back yard and set up some cans. Larry showed Josh how to load the gun, and told him never to point the gun at anyone or dogs, not to shoot at the house, not to shoot at the plow to avoid the BB ricocheting back at him, not to shoot at the neighbors' houses because it could break windows or ricochet back, never to shoot it at anyone because it could put out an eye and because guns kill people, that it was not a toy, that he needed permission to use it, and that Larry or Larry Lee had to be present when the airgun was used. That day, Larry and Josh shot at cans from a distance of about 25 or 30 feet, and the BB's went through both sides of the can. Josh was able to pump the airgun four or five times, and would bring it to Larry to pump up more.

Josh was told to use the airgun in the back yard, where there was a bale of straw that would stop a pellet or a BB. He was not allowed to use the airgun in the front yard because it was too easy for an accident to happen with kids riding up and down the street, because of the trees, and because it could knock out a window.

For the next two weeks, Larry and Josh shot at cans, paper plates, and cardboard boxes every other day in the back yard after school. Larry would pump the airgun as many as 20 times, though Josh would only pump it four or five times. When not in use, the airgun was kept in its box behind Larry's dresser so that it would be more difficult for Josh to get it when he wanted it. BB's were kept on top of a gun cabinet, and Larry would reach up and hand Josh BB's when he wanted to use the airgun.

Tim testified in his deposition that he understood before the shooting incident that shooting the airgun at someone's head from ten feet away after pumping it ten times could kill them. He did not know what could be done by a shot from ten feet away with six pumps, but thought it could break the skin and make someone bleed. Tim had been using BB guns for five years by then with his cousins Ronnie and Rodney Haug, who also had the 760 Pumpmaster and two other BB guns, one a "real powerful BB gun" and the other a spring gun. Tim was not allowed to have a BB gun because he lived in the city, but went to the Hangs' farm every weekend to shoot their guns.

Tim and the Haug boys had BB gun wars in which they would try to shoot each other through the cracks of the barn. Tim had used the Haugs' 760 Pumpmaster two years before the shooting incident with Josh, and had once pumped the airgun ten times and shot it at a burning barrel; the BB dented the barrel and ricocheted off. The boys followed a set of rules during the BB gun wars: no shooting above the waist because someone could get hit in the eye and blinded; pellets were never used; the 760 Pumpmaster could not be pumped more than five or six times because the BB could go through the barn and penetrate and get stuck in the middle of someone's leg. During the BB gun wars, the boys were hit with BB's that broke the skin and caused bleeding through blue jeans at a distance of 40–50 steps with the airgun pumped two or three times. Ronnie once was struck by a BB that lodged in his cheek and caused bleeding; the BB remains in his cheek. Tim knew of this before the shooting incident with Josh.

When Tim's parents found out about the BB gun wars, they told him he shouldn't do that because he could get hurt and a BB could hit someone's eye and put it out. Tim's parents told him the BB gun was not a toy. At the Haugs', an adult was present during shooting at cans, but there was no supervision during the BB gun wars.

Tim never saw the airgun's box or any of the papers that came in it. Larry saw Tim using the airgun two or three times before the incident, and told Tim and Josh how to use the airgun and that it had to be used in the back yard.

On the day of the shooting, Josh wanted to use the airgun, and Larry got it for him.

Josh took the airgun and a container of BB's, set up some pop cans, loaded the gun himself, and began shooting at the pop cans. Tim came over, and at some point on that day, Larry Lee took the airgun away because Tim was shooting it at the dog. He put it away in the attic, and did not realize it was gone until Josh had been shot. Larry was unaware that the boys had been shooting at the dog or that Larry Lee had taken the airgun away, and stated that he would have locked the gun up if he had known because he didn't want the dog to get hurt. While the boys were using the airgun outside, Larry was preparing dinner inside. Tim and Josh took turns shooting at the pop cans and a pile of dry grass. Tim pumped the gun six to seven times. While one was shooting, the other would stand next to or behind him.

The boys later started chasing each other and ended up on the side of the house by the street. Tim shot a tobacco can that was sitting seven or eight steps away on the picnic table in front of Josh's house after pumping the airgun two or three times, and the BB went through both sides of the can. Tim then set up a pop can on a tree branch. Josh hid behind a different tree immediately in front of Tim, and Tim saw him hide there. Tim shot once or twice, hitting the can, before he shot Josh. Before each shot, he called to Josh to watch out because he was going to shoot. On the second or third shot, he received no response from Josh, who poked his head out from behind the tree and was shot in the eye with the BB. This was the first and only time the boys had used the airgun where the one not shooting was not next to or behind the shooter. Tim testified that he knew that the airgun could put Josh's eye out with two or three pumps at that distance, but that he didn't think Josh would poke his head out.

Crosman's Consumer Affairs, Engineering, Marketing, and Quality Control departments collaborate in deciding what types of warnings should be used with Crosman products. Many of the warnings on the airgun's box and in the owner's manual and other litera-

ture in the box result from Crosman's compliance with the ASTM[2] standards for airguns and safety specifications for airguns. The ASTM standards were developed in 1978, after which Crosman began complying with them, and are republished on a five-year cycle. Crosman employees serve on an ASTM committee that discusses the standards for airguns, including James Jereckos, who attended 10–12 of the meetings that occurred at the end of the cycles to discuss appropriate updates and modifications in the standards.

Crosman uses the word "warning" instead of "danger" in compliance with ASTM standards. The warning that airgun products are capable of causing death if misused is used in compliance with ASTM standards. The instruction on the airgun itself to read the owner's manual before using the airgun is used in compliance with ASTM standards.

### II.

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent.

The parties cannot rest on mere allegations in the pleadings, or upon conclusory allegations in affidavits. The court must construe the facts as favorably to the non-moving party as the record will permit, and draw any permissible inferences from the materials before it in favor of the non-moving party, as long as the inferences are reasonable. The non-moving party must show that the disputed fact is material, or

---

**2.** Both parties' briefs mention the ASTM committee and standards; neither gives the group's full name.

outcome-determinative, under applicable law.

*Conery v. Bath Assocs.,* 803 F.Supp. 1388, 1392–93 (N.D.Ind.1992) (citations omitted).

### III.

The defendants contend that the Mosses' strict products liability claim must fail because the airgun's warnings were adequate as matter of law, and, in any event, Josh's death was not proximately caused by the allegedly inadequate warnings that accompanied the airgun. The defendants claim that the warnings in the owner's manual and the accompanying literature, and the directions on the gun itself to read the owner's manual, were reasonable and extensive; they warned that the airgun is not a toy, that adult supervision is required, that misuse or careless use could cause serious injury or death; that the airgun could be dangerous to 475 yards; that the airgun is intended for use by those 16 or older; that the airgun should be treated with the same respect as a firearm; and that personal injury or death can result from improper use or handling if a pellet or BB strikes someone in a vulnerable spot.

The alleged defect in the airgun's warnings, the defendants assert, could not be the proximate cause of Josh's death because Larry and Tim knew that the 760 Pumpmaster could be dangerous if used unsafely. Larry had a broad exposure to BB guns, knew they could put a person's eye out or kill a bird at close range, and had told Josh never to point it at anyone because guns kill people. Larry did not heed the only warning he read, believing it meant death of a bird or small animal, and not a human, and did not read the remainder of the warnings on the box and in the owner's manual and accompanying literature.

The defendants point to Larry's testimony that he is unsure whether he would have changed how and when he let Josh use the airgun had he read the warnings on the box or in the owner's manual or other literature. This testimony, they contend, shows that Larry would have ignored any other warning he may have been given, and that a jury would have to engage in impermissible speculation to find otherwise.

The defendants point out that Tim had been using BB guns for five years before the incident, knew they could put out a person's eye, as evidenced by the boys' BB gun war rule prohibiting shots above the waist, and was specifically familiar with the 760 Pumpmaster. Tim had participated in the BB gun wars in which the participants were hit with 760 Pumpmaster BBs that broke the skin and caused bleeding through jeans from 40–50 steps away with two or three pumps. Most importantly, the defendants contend, Tim knew that death could result from a BB shot in certain circumstances, specifically when the airgun was pumped ten times and shot from ten feet away. On the day of the accident, Tim disregarded common-sense airgun safety rules; the defendants contend that no warning could have changed Tim's behavior.

The Mosses' response focuses on their claim that the 760 Pumpmaster had a penetrating capacity far exceeding the expectations of Larry, Dolores, and Josh Moss, Tim, and of the entire community of consumers who could be exposed to the airgun. Larry and Dolores, the plaintiffs contend, had no idea that the 760 Pumpmaster could kill a human being; had Larry known that it had killed children in the past, he would only have allowed Josh to use the airgun at the shooting range while he was present.

The Mosses contend that an adequate warning should have been placed on the airgun itself, and point to Tim's testimony that he would have read a warning on the airgun. The Mosses argue that although Tim knew that BB guns could put out an eye, "he never knew they could cause death." Tim testified that had he known that pumping the airgun two or three times could cause death, he would never have shot in Josh's direction.

According the to the Mosses, the community of users in LaPorte County, Indiana had no knowledge of the power of the 760 Pumpmaster, and did not know that it could kill a person. The Mosses rely on the testimony of Dennis Francis, the Town Marshall of Kingsford Heights, Indiana, who spent eight years in the Marine Corps with a specialty in small arms repair. Mr. Francis testified that he

had no idea that a BB gun like this could kill a person, and had never heard of such an incident until this one. Mr. Francis has talked with school children since the incident regarding the dangers of weapons such as BB guns; he testified that nobody with whom he spoke was aware that BB guns could cause fatal injuries.

The Mosses retained several experts, and believe that their testimony creates a genuine issue regarding the adequacy of the warnings accompanying the 760 Pumpmaster. Lama Martin, a "gun expert," testified that the general public does not know of the lethal capacity of these BB guns. He does not think the warnings on the 760 Pumpmaster were adequate to warn the consumer appropriately of the gun's specific dangers; this, he believes was the direct cause of the accident. He thought it foreseeable that children would shoot at each other, and that an airgun with a velocity of over 200 feet/second (like the 760 Pumpmaster) was unacceptable for children.

The Mosses' second expert, David Townsend, also a "gun expert," testified that when he tested the 760 Pumpmaster, it penetrated four inches into ordinance gelatin. Mr. Townsend conducted a survey of 14 high school students with the warning from the operational manual of a Daisy BB gun, which he believes are stronger than Crosman's warnings, and the children surveyed "weren't completely convinced that this gun could end up killing you or killing a person." Mr. Townsend believes that information regarding the penetration power of a projectile shot from an airgun is more appropriate to provide to a consumer than the information Crosman provided.

The Mosses' third expert, Gene Litwin, a mechanical engineer, criticized the 760 Pumpmaster's toy-like features, including a plastic stock, the lack of a "bang", and the small and lightweight nature of the airgun and its ammunition, all of which he thought promote a general misunderstanding of the real dangers involved with such high-velocity weapons. Mr. Litwin, the Mosses contend,

has "human factors" training, and has published several articles in that field. He stated in his deposition that Crosman's warnings went beyond inadequacy and were actually misleading. "Misuse or careless use may cause serious injury or death," he believes, is inadequate to advise the consumer that the product actually has caused death in the past. "This gun may be dangerous up to 475 yards," he believes, is an exaggeration that dilutes any effect the warning is intended to have. "Crosman's recommendation for adult supervision" was not enough; he opined that a mandatory proscription against children using the gun should have been provided. He also stated that "danger" should have been used instead of "warning", and that an adequate pictorial warning should be on the airgun itself.

The Mosses' fourth expert, Dr. Alvin Weinstein, a mechanical engineer and human factors expert, testified that the 760 Pumpmaster's warnings were inadequate because: (1) they weren't developed in stages and were not tested; (2) the information on the airgun itself was not a warning at all; (3) the warning on the packaging material did not conform with ANSI Standard Z535 [3]; and (4) they failed to communicate the lethal nature of the weapon. Dr. Weinstein shared his belief that an appropriate warning on the airgun itself would have avoided the shooting incident giving rise to this case.

The Mosses' fifth expert, Dr. Robert Little, a professor of mechanical engineering at the University of Michigan who sits on the ASTM sub-committee on non-powder guns, testified regarding that committee's discussions of warnings at issue before Josh's death. Dr. Little testified that he had tried to convince the committee chairman, James Jereckos, Crosman's Senior Vice President of Engineering and Product Design, and other members of the committee to change the warnings on these airguns to include penetration capacity, but that it was never done. Dr. Little testified that the warning "Not intended for those under 16" is an "aphrodisiac" for small children. He also testified

---

**3.** The Mosses do not explain what this standard requires or why Crosman's warning failed to conform to it.

that he had his engineering students, after seeing certain warnings, rate the intensity or severity of the hazard on a scale of one to ten. The students, he testified, gave very low numbers (1s, 2s, 3s, even a zero) for "not a toy", "may be dangerous up to 475 yards".[4] Dr. Little testified that he thought that proper warnings would advise the consumer that the airgun has the ability to penetrate 4½ to 6 inches into simulated human flesh, and that they have caused 50 to 75 deaths. The alleged inadequacies in the warnings, he opines, were "a definite cause of this shooting" because "the purchase would not have been made" if "the person had understood the power of this gun." Little Dep. at 68.

Mr. Little criticized the process used to design the airgun as lacking specific objectives and as failing to consider the concepts of penetration and accuracy. He thinks the muzzle velocity of this airgun is excessive, and that an airgun of such power serves no defined purpose. Dr. Little believes that those in the manufacturing industry have an ethical obligation to eliminate safety hazards, and that if it cannot be eliminated, it should be guarded against, and that if it cannot be guarded against, there must be instructions and warnings. He noted that the old-fashioned Daisy Red Ryder BB gun was much less powerful, and led to "false disillusionment" regarding the hazards of the multiple pump airguns. Lastly, he reported that in Canada, Crosman manufactures an airgun similar to the one at issue in this case, but with a device to limit muzzle velocity.

The Mosses also rely on the deposition testimony of James Jereckos to show that a feasible, more practicable product design would have afforded better protection, a theory they assert is available in products liability cases in Indiana, as in *Miller v. Todd*, 551 N.E.2d 1139 (Ind.1990), and *Montgomery Ward & Company v. Gregg*, 554 N.E.2d 1145 (Ind.Ct.App.1990). Mr. Jereckos, they point out, concedes that Crosman could have, as it did in Canada, made and sold an airgun with a safety mechanism (a pressure relief valve

or baffle) that a parent could lock on or off to limit the airgun's muzzle capacity.

An affirmative duty, the Mosses assert, is on the manufacturer to design alternatives for safety. They argue that Crosman should have altered its warnings or reduced the airgun's muzzle capacity. They reject any claim of product misuse, because, they assert, intervening causes do not relieve a manufacturer of its duties unless those causes are not reasonably foreseeable. Any intervening cause, they claim, was reasonably foreseeable, relying on Mr. Jereckos's testimony that it was foreseeable that children might use the airguns to intentionally shoot at each other, as in the war games described earlier, that Crosman was aware that children under 16 use the gun without adult supervision or the owner's manual, and that Crosman's employees knew that BB guns had the ability to cause death.

## IV.

The Mosses' strict products liability claim is governed by the Indiana Products Liability Act (the "Act"), IND.Code §§ 33–1–1.5–1 *et seq.*, which provides:

> [A] person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition....

IND.CODE § 33–1–1.5–3(a). A product is in defective when (1) it is in a condition not reasonably contemplated by the expected user of the product and that condition will be unreasonably dangerous to the expected user when the product is handled or consumed in reasonably expectable ways, IND.CODE § 33–

---

4. The Mosses' brief asserts that Dr. Little's students gave similarly low ratings for the warning "May cause injury or death," but the court's review of Dr. Little's deposition reveals the opposite: he stated that *"with the exception of may*

*cause injury or death* each of those other so-called warnings ... have at least on one occasion got a zero and on many occasions got very, very low numbers, one, two, three." Little Dep. at 13.

1–1.5–2.5(a); or (2) if the seller fails to give reasonable warnings of danger about the product when the seller, by exercising due diligence, could have made the warnings available to the user, IND.CODE § 33–1–1.5–2.5(b)(1); Whitted v. General Motors Corp., 58 F.3d 1200, 1205 (7th Cir.1995) ("There are three types of product defects: manufacturing, design, and warning."). A product is unreasonably dangerous where it "exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers." IND.CODE § 33–1–1.5–2.

■ Under § 33–1–1.5–2.5(c), "a product is not defective" if it is "safe for reasonably expectable handling and consumption." If injury results from use "that is not reasonably expectable, the seller is not liable" under the Act.

### 1. Excessive Muzzle Velocity

The Mosses claim that the 760 Pumpmaster is defective and unreasonably dangerous because its muzzle velocity is needlessly excessive and because its community of users does not contemplate that it can cause death. Crosman, they argue, is capable of restricting the airgun's muzzle velocity with a pressure relief valve (as it had done in Canada) or a baffle system to as low as 200 feet/second. They further argue that Crosman knows the 760 Pumpmaster's power is much greater than the community of consumers expects, yet Crosman chose not to restrict the muzzle velocity of the 760 Pumpmaster offered for sale in the United States. Such an alternative safer design, they argue, would have reduced or eliminated the airgun's penetrating capacity and would have prevented Josh's death. They argue that Crosman has an affirmative duty to design alternatives for safety, relying on Montgomery Ward & Co. v. Gregg, 554 N.E.2d 1145 (Ind.Ct.App.1990), and that they can recover for Josh's death because, although the airgun's high velocity did not cause the accident, it enhanced Josh's injuries, relying on Miller v. Todd, 551 N.E.2d 1139 (Ind.1990).

The defendants raise several arguments against this theory of liability. They first contend that the airgun's muzzle velocity is not a "condition", and so cannot be a "defective condition" under § 33–1–1.5–2.5(a). Muzzle velocity, they assert, is a function of the airgun because it affects the airgun's accuracy and range; changing the muzzle velocity of the airgun simply changes it into another, more powerful airgun. To allow the Mosses' claim would be akin to allowing a claim based on the sharpness of a knife. Differences in function levels between different models of products, they argue, serve consumer desires and expectations, and it is anomalous to allow a claim against the manufacturer based solely on the consumer's expectation that the product would not have that function.

The defendants also claim that 760 Pumpmaster muzzle velocity cannot be a defective condition of the airgun because a defective condition must exist at the time a product is put into the stream of commerce (see § 33–1–1.5–3(a)), and does not depend on the user's age or the existence of adult supervision or inadequate warnings, upon all of which the Mosses' experts contend that the defectiveness of the 760 Pumpmaster depends. See Martin Dep. at 111–13 (muzzle velocity of 760 Pumpmaster is not defective for use by those at least 16 or those under 16 when supervised by an adult); Little Dep. at 36, 128 (muzzle velocity of 760 Pumpmaster is not the problem and is appropriate for adult use or use by a 10–12 year old with adult supervision); Litwin Dep. at 167 (muzzle velocity is not a defect where warnings are adequate).

Lastly, the Mosses' claim is for enhanced injuries, which the defendants assert is a claim that Indiana recognizes only in the motor vehicle context.

■ The court agrees with the defendants for a combination of the reasons they assert. The Mosses argue that the design of the 760 Pumpmaster is itself defective and unreasonably dangerous because the airgun has no mechanism to restrict its muzzle velocity to the lower velocity contemplated by many reasonable BB gun users. Under the Act, however, "[t]he requirement that the product be

in a defective condition *focuses on the product itself*, whereas, the requirement that the product be unreasonably dangerous focuses on the reasonable contemplations and expectations of the consumer." *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 685 (Ind. Ct.App.1991) (emphasis added) (upholding summary judgment against plaintiff where product, a respirator for use while welding, was not "in and of itself defective" because it "was not designed or intended to be used" as the plaintiff used it). The "defect" the Mosses suggest is the airgun's muzzle velocity (lack of device to limit the velocity), which is a feature of the airgun itself, not its "design" as meant in the Act.

This case is closely analogous to *Smith v. AMLI Realty*, 614 N.E.2d 618 (Ind.Ct.App. 1993), in which a child's hand was crushed when another child released seventy pounds of weight on it while playing on a Universal weight machine. The child brought an action against the weight machine's manufacturer under the Indiana Products Liability Act. The court found that the "possibility of the weights smashing and tearing the fingers of children" could not render a weight machine unreasonably dangerous within meaning of Act because "it functioned properly as exercise equipment." 614 N.E.2d at 623.[5] Likewise, the 760 Pumpmaster, even with its unrestricted muzzle velocity, functioned properly as an airgun. The airgun's muzzle velocity is not a design defect, and it is not in a defective condition because of its muzzle velocity.

*Anderson v. P.A. Radocy & Sons, Inc.*, 865 F.Supp. 522 (N.D.Ind.1994), *aff'd*, 67 F.3d 619 (7th Cir.1995), also is instructive. The plaintiff in *Anderson* claimed that a crane was defective because it did not guard against electrical shock. Noting that the crane's metal bucket and boom "were not intended to prevent electrical shock or fatal electrocution," the court found that they therefore were not defective within the

meaning of the Act. *Id.* at 531 ("[A] product is not defective for failing to do that which it was not designed to do." (citing *Cox v. American Aggregates Corp.*, 580 N.E.2d 679 (Ind.Ct.App.1991))). Likewise, the 760 Pumpmaster was not designed or intended to have a lower muzzle velocity, and is not defective within the meaning of the Act for having the muzzle capacity that it has. A BB gun, designed to shoot projectiles with the force of air or with springs, varies in range, accuracy, and muzzle velocity; an airgun with a lower muzzle velocity would be a different airgun.

The Mosses' claim goes beyond asserting that the 760 Pumpmaster should have had a feasible and more practicable safety device, *see, e.g. FMC Corp. v. Brown*, 551 N.E.2d 444, 446 (Ind.1990); *Ragsdale v. K–Mart Corp.*, 468 N.E.2d 524, 528 (Ind.Ct.App.1984); *Shanks v. A.F.E. Indus., Inc.*, 403 N.E.2d 849, 858 (Ind.Ct.App.1980), because restricting muzzle velocity changes its performance (and it is this very change in performance that the plaintiffs argue is "safer" in the context of shooting the airgun at people). The "safety device" the Mosses propose is not simply a safety device; it changes the functioning of the airgun, *i.e.* what the airgun is intended to do. In effect, the Mosses claim that the product, the 760 Pumpmaster, is not and cannot be made safe for "reasonably expectable use", which does not state a claim under the Act. *See* IND.CODE § 33–1–1.5–2.5(d) ("A product is not defective under this chapter if the product is incapable of being made safe for its reasonably expectable use, when manufactured, sold, handled, and packaged properly."); *York v. Union Carbide Corp.*, 586 N.E.2d 861, 867–868 (Ind.Ct. App.1992) (discussing distinction between design defect and failure to warn of dangers); *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1166 (Ind.Ct.App.1988) ("Even if virtually faultless in design, material and workmanship, a product may be deemed defective

---

**5.** The *Smith* court, in explaining why weights could not be unreasonably dangerous for smashing childrens' fingers as long as they functioned properly as exercise equipment, analogized to the loaded gun situation:

[Under the Act], an instrument may be "dangerous" as that term is commonly understood,

yet not be "unreasonably dangerous" for purposes of strict liability under the act. For instance, a loaded gun may not be "unreasonably dangerous" for product liability purposes as long as it functions properly, i.e. it hurls a projectile at a target.

*Smith*, 614 N.E.2d at 622.

where the seller fails to discharge its duty to warn or instruct with respect to potential and unknown dangers in the use of the product.").

■ This case is also similar to *Anderson v. P.A. Radocy & Sons*, 865 F.Supp. 522 (N.D.Ind.1994), because the crane operator's employer chose a crane without a feature to guard against electrical shock. 865 F.Supp. at 531.[6] The *Anderson* court found that the defendants could not be held liable for the failure to equip their products with an optional device where that optional device was knowingly rejected. 865 F.Supp. at 531 (citing *Scallan v. Duriron Co., Inc.*, 11 F.3d 1249, 1254 (5th Cir.1994)). When Josh and Larry purchased the 760 Pumpmaster, they had the option of purchasing a different brand or model of airgun with a lower muzzle velocity (the purported safety feature),[7] but Josh wanted the 760 Pumpmaster, as his cousin had. Larry even testified that if the K–Mart salesperson told him at the time of purchase that the 760 Pumpmaster was capable of killing a person (the risk of which would be ended by the safety device the Mosses propose), he still would have purchased it. Larry and Josh passed over a different product (one with lower power and thus lower capacity for serious injury or death), and even Larry, with commendable candor, admits he would have done so knowingly.[8] The court agrees with the reasoning of *Anderson* that the decision relieves the defendants of liability for the purported design defect. *See Anderson*, 865 F.Supp. at 531 (citing *Scallan v. Duriron Co., Inc.*, 11 F.3d 1249, 1254 (5th Cir.1994)). If the 760 Pumpmaster is defective and unreasonably dangerous within the meaning of the Act, it must be because its warnings were inadequate.

■ The defendants' second argument against allowing the Mosses' design defect claim is that Indiana does not recognize such claims outside the motor vehicle context. The Mosses defective design claim is admittedly an "enhanced injuries" claim (also called "second collision" or "crashworthiness" claims, meaning that the claimed defect did not cause the accident or collision, but enhanced the claimant's injuries). In *Miller v. Todd*, 551 N.E.2d 1139, 1142 (Ind.1990), the Indiana Supreme Court announced its recognition of the enhanced injury doctrine as set forth in *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968), as a basis for a products liability cause of action against a manufacturer. 551 N.E.2d at 1142. In adopting the cause of action, the court noted that *Larsen's* imposition on manufacturers of "a duty to use reasonable care to design a vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision" rested on "the statistical inevitability of collisions." 551 N.E.2d at 1141. The court also noted the *Larsen* court's recognition of the policy considerations involved in imposing such a duty: "The normal risk of driving must be accepted by the user but there is no need to further penalize the user by subjecting him to unreasonable risk of injury due to negligence in design." 551 N.E.2d at 1141 (citing *Larsen*, 391 F.2d at 504–505).

Two Indiana Court of Appeals cases appear to articulate a broader enhanced injury concept.[9] In *Masterman v. Veldman's Equip., Inc.*, 530 N.E.2d 312 (Ind.Ct.App.

---

6. There is no indication in *Anderson*, however, that the safety device had any effect on the crane's functioning/performance.

7. As James Jereckos stated in his deposition, the Canadian model (with a pressure relief valve limiting the muzzle velocity to 500 feet/second) was not made available in the United States because "people could just buy a different gun if they wanted the velocity limited." Jereckos Dep. at 181.

8. Larry states that he would have used it differently if he had known of the risks, but that is a

failure to warn claim, not a defective design claim.

9. Some commentators believe that the rationale behind the crashworthiness doctrine is equally appropriate for general use in the products liability context. *See* Note, Litigating Enhanced Injury Cases: Complex Issues, Empty Precedents, and Unpredictable Results, 54 U.Cin.L.Rev. 1257, 1257–58 (1986); Thomas V. Harris, Enhanced Injury Theory: An Analytic Framework, 62 N.C.L.Rev. 643, 649–50 & nn. 39–46 (1984).

1988), a crashworthiness case, the court stated:

> Considering both the common law and the plain language of the statute, the statement of liability simply "for harm caused" imposes no requirement like that of negligence law that the defective/dangerous condition of the product must be a cause of some occurrence, or collision, without which no injuries would have occurred. We, therefore, conclude that Mastermans may state a claim under IC 33–1–1.5–3 for their injuries specifically and additionally caused by the product even though that product did not contribute to causing the collision to occur.

530 N.E.2d at 315; *see also Jackson v. Warrum,* 535 N.E.2d 1207, 1213 (Ind.Ct.App. 1989) (quoting the above paragraph). Though both *Masterman* and *Jackson* involved motor vehicles, and so the courts did not directly address the enhanced injury doctrine's applicability in other contexts, the language implies that a broad interpretation is found in the language of the Act itself. However, in *Miller v. Todd,* decided after *Masterman* and *Jackson,* the Indiana Supreme Court, though also not pressed to decide the exact scope of the cause of action, went beyond the language of the Act to base the cause of action—and "[t]his duty to design a crashworthy vehicle"—on the policies discussed in *Larsen.* The doctrine, the court noted, "merely expands the proximate cause requirement to include enhanced injuries" because "an accident is included in the concept of expected use of a motorcycle." *Miller,* 551 N.E.2d at 1142.

Importantly, in Indiana, an enhanced injury claim enjoys a different standard of proof than other product liability claims under the Act. The *Miller* court prescribed the following method of proof as appropriate in the crashworthiness context: "[a] claimant should be able to demonstrate that a feasible, safer, more practicable product design would have afforded better protection." 551 N.E.2d 1139, 1143; *see also id.* at 1142 (noting that the *Larsen* court "suggests that whether or not the design creates unreasonable danger can be determined using general negligence principles 'which involve a balanc-

ing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm'."). This is the only context in which Indiana has adopted a risk-utility test over the Act's consumer expectation test, under which proof of a feasible and safer design does not itself establish liability. *Anderson v. P.A. Radocy & Sons, Inc.,* 67 F.3d 619, 625 (7th Cir.1995) (citing *Welch v. Scripto–Tokai Corp.,* 651 N.E.2d 810, 815 n. 5 (Ind.Ct.App.1995)) ("[I]f a product is not dangerous to an extent beyond that contemplated by the ordinary consumer, the fact that the product could have been made safer does not establish liability."); *Montgomery Ward & Co. v. Gregg,* 554 N.E.2d 1145, 1154 (Ind.Ct.App.1990) ("*Miller v. Todd* permits a claimant to prove a defect by demonstrating that under the circumstances, a feasible, more practicable product design would have afforded better protection.").

This court's task is to decide the issue as it believes the Indiana Supreme Court would. *Birchler v. Gehl Co.,* 88 F.3d 518, 521 (7th Cir.1996). When "faced with opposing plausible interpretations of state law, we generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability." *Id.* (citing *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1412 (7th Cir.1994)). The Mosses do not cite any Indiana case adopting or applying the enhanced injury doctrine outside the motor vehicle context, and this court has not found such a case. The Indiana Supreme Court itself noted that "[t]he enhanced injury doctrine has been applied to automobiles, motorcycles, airplanes, snowmobiles, front-end loaders, pleasure boats and riding lawnmowers and tractors." *Miller,* 551 N.E.2d at 1140 n. 1 (citation omitted). The court's list does not claim to be exhaustive, but the absence of Indiana cases applying the doctrine in other situations, the *Miller* court's explicit reliance on *Larsen's* finding of the "statistical inevitability of collisions" and policy considerations that include the recognition that "[t]he normal risk of driving must be accepted" lead this court to believe that the Mosses request an expansion of the doctrine (to include the circumstances of this case)

without providing any basis to predict such an expansion. The Mosses have not presented evidence of the statistical inevitability of a BB gun shooting another person, nor that the normal risk of BB gun use is something one must accept in today's society. Thus, even if the Mosses had stated a claim for defective design, this court would not expand Indiana law to allow an enhanced injury claim beyond the crashworthiness context in the circumstances of this case.

### 2. Failure to Warn

■ The Mosses claim, relying on the testimony of several retained experts,[10] that the airgun itself should have had warnings (because Crosman knew that children used the airgun without adult supervision and without the owner's manual, see Jereckos Dep. at 115), and that, in light of the airgun's toy-like features (including its plastic stock, lack of bang sound, and the small and lightweight nature of the airgun itself and its ammunition), stronger warnings were necessary to convey to the consumer that the airgun could kill a human. They propose warnings that state that the airgun was capable of penetrating 4½ to 6 inches into simulated human flesh, and that the airgun has actually caused 50 to 75 deaths (and not that it "may" cause death).

■ In enacting the Indiana Products Liability Act, the legislature "intended to impose liability upon a supplier who puts into the stream of commerce any product without reasonable (adequate) warnings thereby leaving it in a condition unreasonably dangerous to any user, if such warnings could have been given in the exercise of reasonable diligence." *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1166–68 (Ind.Ct.App.1988) ("[A]n inadequate or absent warning renders the dangerous product unreasonably dangerous."); *see also* IND.CODE § 33–1–1.5–2.5(b)(1). Determining

whether a warning is adequate under the Act is governed by the same inquiry as in a negligent failure to warn claim, including the element of proximate cause. *Montgomery Ward & Co. v. Gregg*, 554 N.E.2d 1145, 1156 (Ind.Ct.App.1990); *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541, 550–552 (1979).[11]

The role of warnings under the Act has been described as follows:

> Warnings are typically expected on products that are intentionally marketed despite dangerous properties. A lack of, or inadequacy of, a warning contributes nothing to that danger. Rather, such lack or inadequacy fails to protect against use of the product in an unsafe manner. For the law to require a product which is unreasonably dangerous to also have a "defect" in the form of inadequate warnings is redundant. The statute would seem to require that the product not only be unreasonably dangerous but that it also be in a defective condition. These requirements are appropriate when considering a product which has a manufacturing or design defect. However, it adds nothing to require that a product *unreasonably* dangerous by reason of inadequate warnings also be in a "defective condition." The lack of adequate warning makes a dangerous product unreasonably dangerous. Liability attaches without proof of some additional "defective condition." In this regard, it may be noted that the current statute clearly states that a dangerous product which cannot be made safe for its reasonably expectable use, whether by warnings or otherwise, is not defective. I.C. 33–1–1.5–2.5(d).

*Jarrell*, 528 N.E.2d at 1166. Thus, "although warnings cannot make a dangerous product safe, such warnings may avert liability"; "the

---

**10.** The court expresses no opinion regarding the defendants' discussion of the issue of the Mosses' experts' qualifications and competency to testify on the subjects of adequacy of warnings and proximate cause in their reply brief.

**11.** Considerations in determining whether a warning is reasonable under the circumstances include:

> The warning should be of such intensity to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger. We must therefore consider the adequacy of the factual content, the adequacy of the manner in which that content is expressed, and the adequacy of the method of conveying these expressed facts.
>
> *Jarrell*, 528 N.E.2d at 1162–1163.

absence of warnings ... may render the product such as to be *unreasonably* dangerous." *Id.*

■ The defendants claim that, as a matter of law, the 760 Pumpmaster is not unreasonably dangerous because the warnings were adequate, and because Larry and Tim were aware of the dangers associated with BB gun use. The court need not address whether the BB gun's warnings avert liability for the defendants in this case, because the court finds that the BB gun was not unreasonably dangerous as a matter of law. Whether a product is "defective" or "unreasonably dangerous" is an objective inquiry, focusing on "the product and its manufacturer or seller, as assessed by an objective standard, regarding expected use." *Koske v. Townsend Eng'g Co.,* 551 N.E.2d 437, 440 (Ind.1990). *Cf. Mauller v. Columbus,* 552 N.E.2d 500, 503 (Ind.Ct.App.1990) (with respect to defense of plaintiff's incurred risk, analysis is subjective one "focusing on the plaintiff's actual knowledge and appreciation of the specific risk involved and voluntary acceptance of that risk"; incurred risk is "the conscious, deliberate and intentional embarkation upon a course of conduct with knowledge of the circumstances."). Considerations relevant to the analysis of whether a product was sold "in a defective condition unreasonably dangerous" include "the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users." *Koske,* 551 N.E.2d at 440–441.

■ "A product is not unreasonably dangerous if it injures in a way which, by objective measure, is known to the community of persons consuming the product." *Anderson v. P.A. Radocy & Sons, Inc.,* 865 F.Supp. 522, 531 (N.D.Ind.1994), *aff'd,* 67 F.3d 619 (7th Cir.1995). The defendants argue that the BB gun injured in a way fully known to both Tim and Larry. The Mosses do not argue that the airgun injured in a *way* unknown the them or the community of users, but rather that it injured to an *extent* greater than Josh, Tim, Larry, Dolores, or the community of users ever contemplated. As the defendants point out, the *Anderson* court rejected the plaintiffs' argument that the crane could be unreasonably dangerous be-

cause, although Mr. Anderson knew of the risk of electrical shock, he did not know that the shock he could receive could be fatal: "because Anderson was injured in a *way* which was contemplated by ordinary users (i.e. electrical shock), the products are not unreasonably dangerous." 865 F.Supp. at 531.

The Seventh Circuit affirmed the district court's decision on that issue:

Essentially, [Anderson's] Estate contends that both Anderson and West, reasonable consumers, did not perceive that electrocution was a possibility. Again, the Estate concedes that both men understood that the metal crane and basket would not provide protection from electrical shock. Yet, it is maintained that the men did not know a fatal electric shock could result by the electricity grounding through the tires of the generator. The question becomes whether the difference between an electrical shock and electrocution is one of kind or degree. We answer that the difference is one of degree.

Anderson experienced an initial shock of electricity while standing in the metal basket attached to the steel crane. He was aware that an amount of electricity could surge through his person. The fact that a fatal amount of electricity surged through him is a matter of degree, not a matter of a completely different injury.

*Anderson v. P.A. Radocy & Sons, Inc.,* 67 F.3d 619 (7th Cir.1995).

The Mosses claim that *Anderson* is inapposite to the issues in this case because "in *Anderson* the alleged defect was not latent but was open and obvious. The Plaintiff's decedents were aware of the fact that fatal injuries could result because of the work they were performing and the court based its decision upon this fact." Plaintiff's Response at 13–14. The court agrees with the defendants that the Mosses' characterization is contrary to the facts of *Anderson.* The Estate in Anderson argued that the crane was unreasonably dangerous because "Anderson, as an ordinary user, *did not contemplate receiving a fatal electric shock".* 865 F.Supp. at 530. The court, however, rejected the notion that an expected user must have

contemplated all dangers associated with a product to find the product not unreasonably dangerous. The court contrasted the situation to one where "Anderson and West [believed] that they were protected by the products, only to surprisingly suffer electrical shock." *Id.* at 531.

Similarly, in this case, the ordinary user of a BB gun or airgun is aware of the danger that a projectile fired from it could hit a person and cause serious injury. Tim, Larry, and Josh's own experiences are not determinative under an objective standard, but there is no question that all three had sufficient experience with the 760 Pumpmaster to know that people can be struck and injured with BB's fired from the airgun. Larry's experience was extensive, and Tim had used that very airgun with the Haugs and had seen that it could penetrate flesh, even through jeans from 40 to 50 steps away. Josh was the youngest and least experienced of the three, but even he had seen BB's go through both sides of tin cans. None thought themselves, or people in general, impervious to BB's penetration; the difference between the risk of being hit with a BB and it causing serious eye damage and the risk of being hit with a BB and it causing death is a difference of degree and not of kind. Under the objective standard, the court finds that the ordinary consumer is aware of the risk of being hit by a BB when using a BB gun.

In *Rogers v. R.J. Reynolds Tobacco Co.*, 557 N.E.2d 1045 (Ind.Ct.App.1990), the court discussed the policies behind the rule that a product is not unreasonably dangerous if it injures in a way that is known to the community of consumers. The rule, the court explained, "comports with the 'accident insurance' rationale of strict liability theory; injury resulting from the realization of risk the 'ordinary' consumer calculated in his or her decision to use the product is not accidental." 557 N.E.2d at 1053 (citing *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 440–41 (Ind.1990)). The focus is on the risk, and not on the degree of injury. In *Rogers*, the plaintiff brought a products liability claim against a cigarette manufacturer, claiming the ordinary consumer was without knowl-

edge of the addictive quality of cigarettes, which, when combined with the health risks of smoking, made the cigarettes unreasonably dangerous. The court reversed the grant of summary judgment because a question of fact existed whether "a consumer who chooses to use cigarettes without knowledge of the risk of addiction to the cigarettes, which would prevent him from discontinuing use of the cigarettes and incurring the associated health risks, does so reasonably." 557 N.E.2d at 1055. The Mosses have not raised a genuine issue that the risk that caused Josh's accident—the risk that a BB could accidentally strike a person and cause injury—was unknown to Tim, Josh, Larry, or Dolores, or that it is, by an objective standard, unknown to the community of consumers.

Other courts have reached the conclusion that a product is not unreasonably dangerous using the objective standard *Koske* instructs on the issues of "defective condition" and "unreasonably dangerous" and § 33–1–1.5–2.5(c), which states that a "product is not defective under this chapter if it is safe for reasonably expectable handling and consumption. If an injury results from handling, preparation for use, or consumption that is not reasonably expectable, the seller is not liable under this chapter." "Reasonably expectable use like reasonable care involves questions concerning the ordinary prudent person, or in the case of products liability the ordinary prudent consumer." *Short by Southerland v. Estwing Mfg. Corp.*, 634 N.E.2d 798, 800 (Ind.Ct.App.1994). *Cf. Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 937 (Ind.Ct.App.1994) (in examining element of proximate cause, an "intervening act or omission of a third party will not operate to defeat recovery from the defendant if the act or omission would necessarily, or might reasonably, have been foreseen by the defendant").

The Mosses do not argue that the circumstances involved in this case constitute the intended or reasonably expectable use of the airgun, *i.e.*, use of the ordinarily prudent person. They argue that a reasonable person would not expect the airgun to be so powerful, but this is not the same as arguing that reasonably prudent consumers would use the airgun as Tim and Josh were using

it. Indeed, Tim and Josh broke the few rules set by the adults, even without reading the airgun's warnings that it was not a toy and of the possibility of death, had given them. Their use was not that of the reasonably prudent consumer, even given their ages, in light of the known risks that BB guns present. "The intended purpose of a BB gun obviously does not include pointing and firing a gun ... at another person", *Dias v. Daisy–Heddon,* 180 Ind.App. 657, 390 N.E.2d 222, 225–226; knowingly pointing and firing a BB gun toward another person, even for pre-teens, is not an intended or reasonably expectable use.

The court's conclusion that the airgun is not unreasonably dangerous may seem to render unnecessary the previous discussion regarding whether high or excessive muzzle velocity could be a defective condition under the Act. If the high power of the airgun itself could be a defect, however, that would distinguish this case from *Anderson,* in which the court concluded that ordinary consumers had knowledge of the risk that caused injury. If that risk included a defective product (which because of that defect caused a higher degree of injury), the situation would appear distinguishable. Because that is not the case, the court finds that the 760 Pumpmaster is not unreasonably dangerous, and grants the defendants' summary judgment motion. The court need not address the arguments the defendants raise for judgment on the Mosses' emotional distress damages claim and claim for punitive damages.

## V.

For the foregoing reasons, the court GRANTS the defendants' summary judgment motion (filed July 1, 1996 (# 57)); DENIES the defendants' motion for oral argument (filed Aug. 12, 1996 (# 67)); DENIES AS MOOT the motion to continue the trial (filed July 12, 1996 (# 63)); and VACATES the September 10, 1996 final pretrial conference, the September 16, 1996 trial date, and all other deadlines in this case.

SO ORDERED.